IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID CHMIEL, : | |
| Petitioner : | |
| : | No. 1:06-cv-02098 |
| v. : | |
| : | (Judge Kane) |
| JOHN E. WETZEL, et al., : | |
| Respondents : | **THIS IS A CAPITAL CASE** |

## MEMORANDUM

Before the Court is Petitioner David Chmiel ("Petitioner")'s motion for leave to amend his petition for writ of habeas corpus to add a due process claim challenging microscopic hair comparison analysis evidence presented at his trial. (Doc. No. 146.) For the following reasons, the Court will grant the motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 2002, a jury in the Lackawanna County Court of Common Pleas found Petitioner guilty of three counts of first-degree murder and related charges for killing Angelina Lunario, James Lunario, and Victor Lunario.[1] See Commonwealth v. Chmiel, 889 A.2d 501, 515 (Pa. 2005) ("Chmiel-I").[2]  The evidence at trial included expert testimony concerning microscopic hair comparison analysis of two hairs recovered from a sweater sleeve mask found at the crime scene. (Doc. No. 146-3 ¶ 1.)  George Surma ("Surma") of the Pennsylvania State Police Crime Laboratory testified that the hairs were microscopically similar to Petitioner's hair

---

[1]  This was Petitioner's third trial for these charges.  Following two earlier trials, the Pennsylvania Supreme Court reversed his convictions and death sentences.  See Commonwealth v. Chmiel, 639 A.2d 9 (Pa. 1994); Commonwealth v. Chmiel, 738 A.2d 406 (Pa. 1999).

[2]  For the sake of clarity, the Court will refer to the pertinent state court decisions using the same Roman numerals that are used in the proposed amended petition.  (Doc. No. 146-3 at 2, 174.)

Case 1:06-cv-02098-YK-AP   Document 157   Filed 09/30/22   Page 2 of 9

but not to the hair of his brother, Martin Chmiel ("Martin").  (Doc. No. 146-3 ¶ 3.)  An expert in mitochondrial DNA testified that neither Petitioner nor Martin could be excluded as sources of the hairs.  (Doc. No. 152 at 2-3.)  The evidence concerning the hairs was relevant because Petitioner and Martin admitted that they had agreed to burglarize the Lunarios' home together using sweater sleeve masks, but each claimed to have backed out of the scheme and maintained that the other was responsible for the murders.  (Doc. No. 146-3 ¶¶ 291-293); see also Commonwealth v. Chmiel, 240 A.3d 564, 566-68 (Pa. 2020) ("Chmiel-V").

On September 10, 2002, at the conclusion of the penalty phase, the jury returned a sentence of death.  See Chmiel-I, 889 A.2d at 516.  On December 29, 2005, the Pennsylvania Supreme Court affirmed the verdict and death sentence.  See id. at 510.  On October 2, 2006, the United States Supreme Court denied Petitioner's petition for writ of certiorari.  See Chmiel v. Pennsylvania, 549 U.S. 848 (2006).

On October 25, 2006, Petitioner filed a motion in this Court for appointment of federal habeas counsel and to proceed in forma pauperis.  (Doc. No. 1.)  The Court granted that motion on November 1, 2006 and set a deadline of April 30, 2007 to file the petition.  (Doc. No. 3.)  The Court subsequently extended the deadline to June 15, 2007.  (Doc. No. 19.)

On March 21, 2007, Petitioner filed a pro se petition under the Pennsylvania Post Conviction Relief Act ("PCRA") in the Lackawanna County Court of Common Pleas.  (Doc. No. 146-3 at 13.)  On June 15, 2007, he filed a motion to stay the proceedings in this Court pending exhaustion of his claims in state court (Doc. No. 20), which the Court granted on July 16, 2007 (Doc. No. 21).  The PCRA court denied post-conviction relief.  See Commonwealth v. Chmiel, No. CP-35-CR-0000748-1983 (Lack. Cnty. Ct. Com. Pl. filed Feb. 27, 2009) ("Chmiel-II").

2

(Doc. No. 45-4 at 8.)  On November 9, 2011, the Pennsylvania Supreme Court affirmed that decision.  See Commonwealth v. Chmiel, 30 A.3d 1111 (Pa. 2011) ("Chmiel-III").

One of the claims in the PCRA petition was that Petitioner's trial counsel was ineffective by failing to limit the damage of the microscopic hair comparison analysis evidence, including by failing to seek exclusion of the evidence as unreliable pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).  See Chmiel-III, 30 A.3d at 1138.  The supreme court rejected this claim, in part because Petitioner did not "provide any support for the view that as of [his] 2002 trial, forensic hair microscopy was no longer an accepted science."  See id. at 1142.  The court found that the record established "just the opposite," citing testimony by Petitioner's expert at the PCRA hearing that microscopic hair comparison analysis "is performed in crime labs run by the FBI, the Chicago police, and the Houston police."  See id.

On May 18, 2012, Petitioner filed his petition for writ of habeas corpus in this Court (Doc. No. 32), followed by his memorandum of law on December 14, 2012 (Doc. 45).  The petition included the claim made in the PCRA court that trial counsel was ineffective by failing to limit the prejudice of the microscopic hair comparison analysis evidence.  (Doc. No. 32 ¶¶ 1-26.)   Respondents filed their answer to the petition on September 26, 2013 (Doc. No. 55), followed by a memorandum of law on September 27, 2013 (Doc. No. 57).  The Court subsequently granted Petitioner's motion for discovery, including requests for materials relevant to the expert testimony Surma offered at trial.  (Doc. No. 69).  The Court also stayed further briefing on the petition pending the outcome of discovery.  See id.

On April 20, 2015, the FBI issued a press release disclosing that an internal investigation had found that testimony and statements provided by its microscopic hair comparison analysts included erroneous statements in most cases.  (Doc. No. 146-5 at 186-88.)  The press release also

disclosed that, "[o]ver the course of 25 years, the FBI conducted multiple two-week training courses that reached several hundred state and local hair examiners throughout the country and that incorporated some of the same scientifically flawed language that the FBI examiners had used in some lab reports and often in trial testimony." (Id. at 190.) On June 18, 2015, Petitioner filed a successive PCRA petition, relying on the disclosures in the FBI press release to claim that his conviction and sentence rested on fundamentally unreliable expert testimony and thereby violated due process. (Doc. No. 146-5 at 244-48.) He acknowledged that the petition was filed after the PCRA's one-year time bar, but he invoked the exception that applies if "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." (Doc. No. 146-5 at 250) (quoting 42 Pa. Cons. Stat. § 9545(b)(1)(ii)).

The PCRA court initially dismissed the petition as untimely, but the Pennsylvania Supreme Court reversed that decision and remanded for a hearing on the merits of the claim. See Commonwealth v. Chmiel, 173 A.3d 617 (Pa. 2017) ("Chmiel-IV"). The supreme court found that Petitioner satisfied the exception for newly discovered facts because his claim was predicated upon two newly discovered facts made public for the first time in the FBI press release: (1) the FBI's public admission that the testimony and statements provided by its analysts about microscopic hair comparison analysis were erroneous in the vast majority of cases; and (2) the revelation that the FBI had trained many state and local analysts to provide the same scientifically flawed opinions in state criminal trials. See id. at 625. Because "the FBI press release indicates that Surma's trial testimony may have exceeded the limits of science and overstated to the jury the significance of the microscopic hair analysis," the court concluded that Petitioner was entitled to a merits determination of his claim. See id. at 625-26. The court also

rejected the PCRA court's conclusion that Petitioner was not entitled to relief because his claim had been previously litigated in connection with the ineffective assistance of counsel claim in the first PCRA proceeding.  See id. at 627-28.

Following that decision, Petitioner filed a motion to stay the proceedings in this Court pending exhaustion of state court remedies (Doc. No. 122), which the Court granted on February 13, 2018 (Doc. No. 127).  After holding an evidentiary hearing, the PCRA court denied relief on the merits.  The Pennsylvania Supreme Court affirmed that decision on October 21, 2020, see Chmiel-V, 240 A.3d at 575, and denied Petitioner's application for reargument on December 23, 2020.  (Doc. No. 147 at 2).

On August 20, 2021, Petitioner filed an unopposed motion to lift the stay in this Court (Doc. No. 145) and the present motion to amend his habeas petition (Doc. No. 146), accompanied by a memorandum of law (Doc. No. 147).  The motion to amend seeks leave to add the now-exhausted claim alleging that Petitioner's convictions and death sentence rest on unconstitutionally unreliable expert evidence in violation of due process.  On December 23, 2021, the Court lifted the stay and directed Respondents to file a response to the motion to amend.  (Doc. No. 151.)  Respondents filed their response on January 6, 2022 (Doc. No. 152), and Petitioner filed his reply on January 27, 2022 (Doc. No. 156).  Having been fully briefed, the motion is ripe for disposition.

## II.   LEGAL STANDARD

Motions to amend federal habeas petitions are governed by Federal Rule of Civil Procedure 15, which allows amendments to petitions with leave of the Court at any time during the proceeding.  See Mayle v. Felix, 545 U.S. 644, 655 (2005) (citing Fed. R. Civ. P. 15(a)).  "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  "If the

underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Foman v. Davis, 371 U.S. 178, 182 (1962). Although the decision is within the discretion of the Court, leave to amend generally should be granted absent reasons such as undue delay, bad faith or dilatory motive, undue prejudice to the opposing party, or futility. See id.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year limitation period on federal habeas petitions filed pursuant to 28 U.S.C. § 2254. AEDPA provides in relevant part that the one-year period runs from the latest of "(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; [or] . . . (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." See 28 U.S.C. § 2244(d)(1). For purposes of § 2244(d)(1)(D), the "factual predicate" of a claim constitutes the "vital facts" underlying the claim. See McAleese v. Brennan, 483 F.3d 206, 214 (3d Cir. 2007). The one-year limitations period is statutorily tolled during the time when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." See 28 U.S.C. § 2244(d)(2).

## III. DISCUSSION

The issue here is whether leave to amend should be denied because Petitioner's newly asserted due process claim is barred by AEDPA's statute of limitations. Petitioner contends that the due process claim is timely because he filed the motion to amend within one year from "the date on which the factual predicate of [the claim] could have been discovered through the exercise of due diligence," excluding the period of time that the one-year limitations period was tolled while the second PCRA proceedings were pending in state court. (Doc. No. 147 at 3-4)

(quoting 28 U.S.C. § 2244(d)(1)(D)); see also 28 U.S.C. § 2244(d)(2). His position is that the "vital fact" constituting the factual predicate of the claim is the FBI's "distancing from its earlier practice of [microscopic hair comparison] analysis and from the manner in which it had regularly presented such evidence to juries." (Doc. 147 at 4); see McAleese, 483 F.3d at 214.

Respondents do not argue that the substance of the FBI press release could have been discovered before April 20, 2015, or that the amendment would be untimely if the limitations period began to run on that date. See (Doc. No. 152 at 11-14). Rather, their position is that Petitioner discovered nothing pertinent from the press release because it did not state that microscopic hair comparison analysis was "invalid as a science" and he already knew he could challenge the evidence as unreliable because he had been "waging war against the science itself since the filing of his first PCRA petition." (Id. at 12.) They also assert, but without elaboration, that Petitioner's statistician would have been available years ago to offer the same opinion that was offered in testimony in the recent PCRA proceedings. (Id. at 13.) Thus, the dispute centers on whether the new facts disclosed in the FBI press release are indeed the "vital facts" required to support Petitioner's newly asserted due process claim.

To resolve this issue, it is necessary to identify the contours of the claim. See McAleese, 483 F.3d at 213-14. Petitioner alleges that his conviction and sentence "rested on 'what new scientific evidence has proven to be fundamentally unreliable expert testimony' and its admission 'undermine[s] the fundamental fairness of the entire trial' in violation of due process." (Doc. No. 146-3 ¶ 289) (quoting Lee v. Glunt, 667 F.3d 397, 403-04 (3d Cir. 2012)). Petitioner frames his claim as the petitioner did in Lee, attacking the reliability of the expert testimony based on new scientific developments. See Lee, 667 F.3d at 407-08 ("If Lee's expert's independent analysis of the fire scene evidence—applying principles from new developments in

7

fire science—shows that the fire expert testimony at Lee's trial was fundamentally unreliable, then Lee will be entitled to federal habeas relief on his due process claim.").

The facts Petitioner alleges to support the due process claim focus on the new scientific developments, including: (1) the FBI's disclosure on April 20, 2015 that its analysts made erroneous representations about the reliability of microscopic hair comparison evidence in the vast majority of cases where such evidence was used to inculpate a defendant, including in death penalty cases (Doc. No. 146-3 ¶ 286); (2) the fact that since this disclosure "there has been a sea change within the scientific and forensic communities" related to microscopic hair comparison analysis evidence, such that scientists now "uniformly agree that such evidence does not meet the scientific criteria for foundational validity because it has not been demonstrated that it is either a consistent or an accurate method" (id. ¶ 288); and (3) the fact that any conclusions drawn from microscopic hair comparison analysis alone without meeting these criteria "are scientifically meaningless" (id.). These allegations are specifically tied to the disclosures in the FBI press release or scientific developments thereafter. As Petitioner has framed his claim, its factual predicate is the new scientific developments in the field of microscopic hair comparison analysis prompted by and following the FBI press release.

In finding that the claim made in Petitioner's second PCRA petition was predicated on newly discovered evidence, the Pennsylvania Supreme Court pointed out that the FBI press release was not "simply confirmation of information that was already available in the public domain." See Chmiel-IV, 173 A.3d at 625. Instead, it revealed "the FBI's admissions, as the proponent of microscopic hair analysis, that its examiners gave flawed and scientifically unsupportable testimony, and spread its flawed methodology to state and local analysts." See id. at 626. Respondents do not discuss the supreme court's analysis on this point or offer any reason

that this Court should not reach a similar conclusion for purposes of 28 U.S.C. § 2244(d)(1)(D). Whether Petitioner can demonstrate that microscopic hair comparison analysis is "invalid as a science" and the relevance of evidence offered by his statistical expert to that claim are issues that relate to the merits of the claim, and it would be premature to address them at this stage.

Petitioner has provided sufficient reason for the Court to conclude that his due process claim is timely under §§ 2244(d)(1)(D) and 2244(d)(2), such that amendment would not be futile. Therefore, the Court will exercise its discretion to grant leave to amend and thereby afford Petitioner the opportunity to test the claim on the merits. Because the Court is persuaded to grant leave to amend on this basis, the Court finds it is unnecessary to address Petitioner's alternative argument that the due process claim relates back to the ineffective assistance of counsel claim in the original position. (Doc. No. 146 at 2.)

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Petitioner's motion to amend. (Doc. No. 146.) An appropriate Order follows.