**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID CHMIEL,** | : | |
| **Petitioner** | : | |
| | : | **No. 1:06-cv-02098** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **LAUREL HARRY,[1] et al.,** | : | |
| **Respondents** | : | **THIS IS A CAPITAL CASE** |

**MEMORANDUM**

Before the Court is Petitioner David Chmiel ("Petitioner")'s Renewed Second Motion to

Compel Discovery. (Doc. No. 161) The motion requests that the Court compel Respondents to

produce certain documents which Respondents contend are privileged or, in the alternative, that

the Court conduct in camera review of the documents to determine whether they should be

produced to Petitioner. (Id. ¶¶ 3, 8.) For the reasons set forth below, the Court will grant

Petitioner's motion in part, conduct in camera review of the documents, and direct Respondents

to produce specified documents for Petitioner's review.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

Following a 2002 jury trial in the Lackawanna County Court of Common Pleas,

Petitioner was convicted of three counts of first-degree murder and related charges and sentenced

to death for the murder of three elderly siblings, Angelina Lunario, James Lunario, and Victor

Lunario, during a burglary of their home on September 21, 1983.[2] See Commonwealth v.

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Laurel Harry, the current Secretary of the Pennsylvania Department of Corrections, is substituted for George Little, the former Acting Secretary of the Pennsylvania Department of Corrections.

[2]  This was Petitioner's third trial on these charges. He was convicted and sentenced to death following two earlier jury trials, but in both cases his convictions were reversed by the Pennsylvania Supreme Court on direct appeal. See Commonwealth v. Chmiel, 639 A.2d 9 (Pa. 1994) ("Chmiel I"); Commonwealth v. Chmiel, 738 A.2d 406 (Pa. 1999) ("Chmiel II").

Chmiel, 889 A.2d 501, 515-16 (Pa. 2005) ("Chmiel III").  The Pennsylvania Supreme Court affirmed on direct appeal, and the United States Supreme Court denied certiorari.  See id. at 509; Chmiel v. Pennsylvania, 549 U.S. 848 (2006).

Petitioner thereafter sought relief under the Pennsylvania Post Conviction Relief Act ("PCRA").  See Commonwealth v. Chmiel, 30 A.3d 1111, 1123 (Pa. 2011) ("Chmiel IV"). Petitioner claimed, inter alia, that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963), and Napue v. Illinois, 360 U.S. 264 (1959), by withholding information concerning deals or understandings between the prosecutor and two key witnesses and by failing to admit that such deals or understandings existed when the witnesses denied them during their trial testimony. See Chmiel IV, 30 A.3d at 1129.  Petitioner also alleged that his trial and appellate counsel were ineffective for failing to pursue these claims at trial or on direct appeal.  See id. at 1130.

The witnesses at issue were Petitioner's brother, Martin Chmiel ("Martin"), and his brother-in-law, Thomas Buffton ("Buffton"), who was at the time of the murders married to Petitioner's sister, Nancy Moran ("Moran").  See id. at 1131.  Martin was initially identified as a suspect in the murders after a mask fashioned from a sweater belonging to him was found at the crime scene and police learned that Martin was aware that the Lunarios kept large quantities of cash hidden in their home.  See id. at 1124.  When  confronted with the mask, Martin told police that he and Petitioner had planned to rob the Lunarios using sweater sleeve masks but that Martin backed out of the plan.  See id.  Martin told police that Petitioner later admitted to him that he had committed the murders and provided details of the crime, which police determined could only have been known by the perpetrator.  See id.  Martin provided an alibi for his own whereabouts at the time of the murders, claiming that he was with Buffton at an overnight fire watch on the premises of Buffton's employer.  See id.  Martin and Buffton testified for the

Commonwealth at all three of Petitioner's trials.  See id. at 1131.  Martin testified regarding Petitioner's confession to him, and Buffton provided an alibi for Martin during the time of the murders.  See id.

Petitioner's Brady and Napue claims concern promises of favorable treatment he alleges that Martin and Buffton received in exchange for their testimony.  See id. at 1131-32.  In their testimony at Petitioner's 2002 trial, Martin and Buffton admitted that they had been convicted of charges arising from an arson scheme in which Martin agreed to set fire to the Buffton home so that Buffton and Moran could collect the proceeds of an insurance policy.  See id. at 1131. Martin and Buffton acknowledged that their sentences had been reduced and that they served relatively short terms of imprisonment on favorable terms.  See id.  However, both denied that their testimony was given as part of a deal with the Commonwealth.  See id. at 1131-32.

In his PCRA petition, Petitioner alleged that Martin and Buffton had in fact been promised leniency with respect to the arson charges in exchange for their testimony.  See id. at 1129; (Doc. No. 54-107 at 4).  Petitioner moved for discovery of exculpatory or impeachment evidence concerning Martin or Buffton.  (Doc. Nos. 32 ¶ 121, 45-4 at 40-43.)  The PCRA court denied that request, except with regard to materials in the criminal court files of Martin and Buffton and their presentence investigations reports.  (Doc. Nos. 32 ¶ 121, 45-4 at 3.)

At an evidentiary hearing in the PCRA court, Petitioner offered the testimony of Buffton and Moran concerning meetings they had with two state troopers and Assistant District Attorney Ernest Preate ("ADA Preate") prior to Petitioner's first trial in 1984.  See Chmiel IV, 30 A.3d at 1132.  Buffton testified that ADA Preate and the troopers told him that they could not formally offer a deal because "it would look like my testimony was bought."  See id. (citation omitted). However, based on the meetings, Buffton and Moran claimed that they understood they would

receive several benefits if Buffton testified in support of Martin's alibi and pled guilty to the arson charges: (1) Moran would not be prosecuted for the arson; (2) Buffton would receive reduced prison time for the arson, followed by work release; (3) Buffton would not be prosecuted for two unrelated burglaries; and (4) Buffton would receive assistance with expunging his record at some point in the future.  See id.; (Doc. Nos. 54-79 at 15-20, 54-86 at 7-10).

The PCRA court denied relief on Petitioner's Brady claims, finding that he had not established the requisite prejudice.  See Chmiel IV, 30 A.3d at 1133.  On appeal from that decision, the Pennsylvania Supreme Court held that the Brady claims were waived, noting that Petitioner "provide[d] no indication as to when or how he became aware of the alleged Brady material, all of which would appear to have been available at the time of his trial (his third) or on direct appeal."  See id. at 1129.  However, the court addressed the Brady claims for the purpose of analyzing Petitioner's related ineffective assistance of counsel claims.  See id. at 1130-34. The court concluded that Petitioner failed to establish that his trial or appellate counsel were ineffective, in part because he had not shown that the allegedly withheld Brady evidence was material.  See id. at 1133-34.

On May 18, 2012, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc. No. 32.)  Claim II.A of the petition alleges that the Commonwealth violated Brady and Napue by failing to disclose that Martin and Buffton received promises of leniency in exchange for their testimony and by failing to correct their false testimony on that subject.  (Id. ¶¶ 105-145.)

On September 24, 2014, the Court granted Petitioner's motion for discovery.  (Doc. No. 69.)  The Court found that Petitioner had shown good cause for discovery to support Claim II.A, including his request for the homicide file of the Lackawanna County District Attorney's Office

4

("DA's Office"), which prosecuted the first trial.  (Doc. Nos. 69 at 7, 53-2 at 5.)  On July 8,

2015, Petitioner filed a motion to compel discovery, seeking the file of the Office of the Attorney

General ("OAG"), which prosecuted the second and third trials.  (Doc. No. 88.)  That motion

was based on a letter to Petitioner's counsel in which Respondents' counsel indicated that any

files that may have been provided by the DA's Office were likely incorporated into the OAG

files.  (Id. ¶ 8.)  Respondents objected to producing the entire OAG file on the ground that

Petitioner had failed to show good cause.  (Doc. No. 95 at 10-11.)  Respondents also asserted

that the file included privileged information, which they indicated would be identified in a

privilege log if the Court ordered production of the entire OAG file.  (Id. at 10.)

On March 7, 2016, the Court granted Petitioner's motion to compel discovery and

ordered Respondents to produce the entire OAG file for Petitioner's review.  (Doc. No. 99 at 8.)

The Court also directed Respondents to file a privilege log pursuant to Federal Rule of Civil

Procedure 26(b)(5) as to any documents that they asserted were privileged.  (Id.)  Respondents

thereafter produced the OAG file for review by Petitioner's counsel and filed a privilege log that

listed numerous documents withheld on the basis of the work-product privilege.  (Doc. No. 102.)

On May 5, 2017, Petitioner filed a second motion to compel discovery, seeking

production of specified documents listed in the privilege log.  (Doc. Nos. 112, 113.)  Petitioner

contended that the specified documents likely included information relevant to Claim II.A or

were listed in the privilege log without sufficient information to permit Petitioner to assess the

claim of privilege.  (Doc. No. 113 ¶ 19.)  In the alternative, Petitioner requested that the Court

review the documents in camera to identify any material that should be disclosed.  (Id.)

Respondents opposed both production of the documents and in camera review on the ground that

Petitioner had not established that the documents contained any Brady or Napue information.

(Doc. No. 117 at 9-10.)  On November 29, 2017, the Court ordered that the motion to compel be deferred pending the Court's in camera review of the specified documents and directed Respondents to provide those documents to the Court.  (Doc. No. 121.)

On February 13, 2018, the Court granted Petitioner's unopposed motion to stay the federal habeas proceeding to permit him to exhaust state remedies concerning an unrelated due process claim.  (Doc. No. 127.)  The Court simultaneously denied Petitioner's motion to compel discovery without prejudice to his right to refile that motion in the event that the Court lifted the stay after completion of the state court proceedings.  (Id.)  On October, 21, 2020, the Pennsylvania Supreme Court affirmed the PCRA court's denial of relief on the due process claim.  See Commonwealth v. Chmiel, 240 A.3d 564 (Pa. 2020) ("Chmiel V").  On December 23, 2021, the Court granted Petitioner's motion to lift the stay.  (Doc. No. 151.)  On September 30, 2022, the Court granted Petitioner's motion to amend his habeas petition to add the newly exhausted due process claim.  (Doc. No. 158.)  The amended petition, which is now the operative petition, made no changes to Claim II.A.  (Doc. No. 159 ¶¶ 105-145.)

On November 22, 2022, Petitioner filed the instant motion and a supporting brief.  (Doc. Nos. 161, 162.)  The instant motion seeks the same relief as the earlier motion to compel.  (Doc. No. 112.)  Petitioner requests that the Court compel Respondents to produce sixteen (16) documents, listed in Exhibit C to Petitioner's supporting brief, or, in the alternative, that the Court conduct in camera review of those documents to determine whether they should be produced to Petitioner.  (Doc. Nos. 161 ¶¶ 3, 8, 162 ¶ 46, 162-1 at 8-9.)   Respondents did not file a brief in opposition to the instant motion.  However, the Court does not consider the instant motion to be unopposed, see M.D. Pa. L.R. 7.6, because Respondents did file a brief opposing the original and substantively identical version of the instant motion.  (Doc. Nos. 112, 117.)  In

deciding the instant motion, the Court will consider Respondents' brief in opposition to the original motion (Doc. No. 117), as well as the reply brief Petitioner filed in response (Doc. No. 119). Respondents have provided the documents at issue to the Court for <u>in camera</u> review. (Doc. No. 166.) Thus, the motion is fully briefed and ripe for disposition.

## II.     LEGAL STANDARD

Rule 6(a) of the Rules Governing Section 2254 Cases provides that a district court may, for "good cause," authorize a habeas petitioner to conduct discovery under the Federal Rules of Civil Procedure. <u>See</u> 28 U.S.C. § 2254 Rule 6(a). "Good cause" exists when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." <u>See</u> <u>Bracy v. Gramley</u>, 520 U.S. 899, 909 (1997) (citation and quotation marks omitted). The scope and extent of discovery is a matter committed to the district court's discretion. <u>See</u> <u>id.</u> A district court may abuse its discretion if it denies discovery that is essential for a habeas petitioner to fully develop his claim. <u>See</u> <u>Lee v. Glunt</u>, 667 F.3d 397, 404-05 (3d Cir. 2012).

The work-product doctrine, first announced in <u>Hickman v. Taylor</u>, 329 U.S. 495 (1947), recognizes "a qualified privilege for certain materials prepared by an attorney 'acting for his client in anticipation of litigation.'" <u>See</u> <u>United States v. Noble</u>, 422 U.S. 225, 237-38 (1975) (quoting <u>Hickman</u>, 329 U.S. at 508). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." <u>Id.</u> at 238. The doctrine "is an intensely practical one, grounded in the realities of litigation in our adversary system." <u>See</u> <u>id.</u>

The work-product doctrine has been partially codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. <u>See</u> <u>Sporck v. Peil</u>, 759 F.2d 312, 316 (3d Cir. 1985). Rule

26(b)(3)(A) provides that "documents and tangible things that are prepared in anticipation of litigation or for trial" are not discoverable unless the party seeking discovery "shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  See Fed. R. Civ. P. 26(b)(3)(A).  "If a court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  See Fed. R. Civ. P. 26(b)(3)(B).

Rule 26(b)(3) thus recognizes the distinction between "ordinary" and "opinion" work product first articulated in Hickman.  See Sporck, 759 F.2d at 316.

> Opinion work product includes such items as an attorney's legal strategy, his intended lines of proof, his evaluation of the strengths and weaknesses of his case, and the inferences he draws from interviews of witnesses.  Such material is accorded an almost absolute protection from discovery because any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases.

See id. (citations omitted).  Despite this enhanced protection, neither the United States Supreme Court nor the Third Circuit Court of Appeals has held that opinion work product is never discoverable.  See Upjohn v. United States, 449 U.S. 383, 401-02 (1981); In re Cendant Corp. Sec. Litig., 343 F.3d 658, 664 (3d Cir. 2003).  Although it has not squarely decided the issue, the Supreme Court has suggested that disclosure of opinion work product would require a heightened showing of substantial need and inability to obtain the equivalent without undue hardship.  See Upjohn, 449 U.S. at 401-02.  Relying on this discussion, the Third Circuit has held that disclosure of opinion work product "requires a heightened a showing of extraordinary circumstances."  See In re Cendant Corp. Sec. Litig., 343 F.3d at 664 (citations omitted).

### III.  DISCUSSION

The Court will first address Petitioner's contention that Respondents have waived the work-product privilege by failing to assert it in a timely manner and by providing inadequate descriptions of certain documents listed in the privilege log.  (Doc. No. 162 at 13-14.)  Petitioner made the same argument regarding untimeliness in his motion to compel production of the entire OAG file.  (Doc. No. 88 at 8-9.)  In its order granting that motion, the Court directed Respondents to produce a privilege log pursuant to Federal Rule of Civil Procedure 26(b)(5) as to any documents in the OAG file which they asserted were privileged.  (Doc. No. 99 at 8.) Respondents complied with that order by filing a privilege log on May 16, 2016.  (Doc. No. 102.)  Petitioner does not claim that he suffered prejudice that would have been avoided had Respondents filed the privilege log at an earlier point or offer any other reason for the Court to reconsider its earlier decision directing Respondents to file the privilege log.  See (Doc. No. 162 at 13-14.)  Further, the Court concludes that it is unnecessary to address the adequacy of the descriptions provided in the privilege log because the Court's in camera review of the documents will resolve that issue.  Accordingly, the Court rejects Petitioner's contention that Respondents have waived the work-product privilege.

The Court will next address Respondents' opposition to in camera review.  (Doc. No. 117 at 9-10.)  In granting Petitioner's first motion to compel, the Court found good cause for discovery of the complete OAG file.  (Doc. No. 99 at 7-8.)  As the party claiming the protection of the work-product privilege, the Commonwealth bears the burden of proving that it applies to documents withheld on that basis.  See In re Grand Jury Subpoena, 745 F.3d 681, 693 (3d Cir. 2014) (citation omitted).  The Court concludes that in camera review of those documents is an appropriate means of assessing the validity of Respondents' claim of work-product privilege and

9

balancing it against Petitioner's need for information that is relevant to Claim II.A.  See United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 967 (3d Cir. 1988).  For this reason, the Court rejects Respondents' contention that in camera review is not appropriate.

Based on its in camera review, the Court accepts Respondents' representation that the documents include attorney notes and were "prepared in anticipation of litigation or for trial." See Fed. R. Civ. P. 26(b)(3)(A).  The Court also agrees with Respondents that these documents include notes that may to some extent reveal "the thoughts, impressions, and mental processes of the prosecutors."  (Doc. No. 117 at 9); see Fed. R. Civ. P. 26(b)(3)(B).  Therefore, the Court must determine whether Petitioner has shown that "extraordinary circumstances" warrant disclosure of any portion of this opinion work product.  See In re Cendant Corp. Sec. Litig., 343 F.3d at 664.  In doing so, the Court will consider whether Petitioner's need for any factual content in the documents outweighs "the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases."  See Sporck, 759 F.2d at 316.

The first step in this analysis is to determine whether any of the documents include information that is relevant to Claim II.A.  Based on its in camera review, the Court finds that the only documents that include relevant information are Documents 12 and 13.[3]  Document 12 consists of 120 pages of an attorney's handwritten notes, dated over a period of months.  (Doc. No. 166 at 2.)  Although the dates do not specify the year, it appears from the context that the notes were made in preparation for Petitioner's 2002 trial.  The notes in Document 12 include references to various tasks and reminders related to trial preparation, including what appear to be

---

[3]  The Court will refer to the documents by the numbers assigned to them in the notice filed by Respondents when they submitted the documents for in camera review.  (Doc. No. 166.)

questions the prosecutor intended to cover in preparing witnesses to testify.  Document 13 consists of 169 pages of an attorney's handwritten notes that appear to be outlines for the direct examination of prosecution witnesses.  (Id.)  While these outlines are undated, it appears that they were prepared for use in Petitioner's 2002 trial because they include citations to the transcripts of Petitioner's first and second trials.  The Court concludes that the following portions of these documents are directly relevant to Claim II.A: (1) three (3) notes in Document 12 that appear to indicate questions related to the disposition of the arson-related charges that the prosecutor intended to cover in preparing for the trial testimony of Martin and Buffton; and (2) three (3) pages of Document 13 that include the portions of the direct examination outlines for Martin and Buffton that relate to the disposition of the arson-related charges and whether Martin and Buffton were promised anything in exchange for their testimony.

The Court must next address whether Petitioner has shown a substantial need for the factual content of these notes and outlines.  The primary consideration is the nature of the disputed issues underlying Petitioner's claims.  Petitioner alleges that the Commonwealth violated Brady and Napue by withholding evidence that Martin and Buffton were promised favorable treatment in exchange for their testimony and by failing to correct their allegedly false testimony.  (Doc. No. 159 ¶¶ 105-145.)  The disputed issues include the full scope of any understandings between the Commonwealth and Martin or Buffton and what the prosecutor knew or should have known concerning that subject when Martin and Buffton testified in Petitioner's 2002 trial.

Petitioner relies on two decisions in which district courts found that opinion work product was discoverable precisely because it would furnish evidence of the prosecutor's mental impressions or opinions concerning prosecution witnesses.  (Doc. No. 162 at 17-18); see Roberts

v. Warden, San Quentin State Prison, No. 93-cv-00254, 2012 WL 5523430, at *4 (E.D. Cal. Nov. 14, 2012) (finding that documents showing prosecutor's "mental impressions or reflecting his legal analysis may well also show what he knew, or should have known, about impeaching evidence" regarding prosecution witnesses and "may very well be the best evidence of what [the prosecutor] knew about his witnesses or should have known and when he knew it or should have known it"); Harris v. United States, No. 97-cv-01904, 1998 WL 26187, at *2-3 (S.D.N.Y. Jan. 26, 1998) (finding that work-product doctrine did not preclude disclosure of relevant opinion work product where contested issues included whether government complied with Brady obligations, whether government witnesses committed perjury, and if so, whether government knew of the perjury at the time).

The Court is persuaded by the reasoning of these decisions in the context of Petitioner's claims. The mental impressions and opinions of the prosecutor concerning the disposition of the arson-related charges and the process of preparing Martin and Buffton to testify are matters directly at issue in Petitioner's Brady and Napue claims. Moreover, the factual content of the notes identified by the Court is not available from other sources because the notes furnish unique contemporaneous evidence concerning the witness preparation process that occurred over twenty years ago. Based on these circumstances, the Court concludes that the need for disclosure of the limited notes and outlines that the Court has found are directly relevant to Claim II.A outweighs "the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases." See Sporck, 759 F.2d at 316. Therefore, the Court finds that "extraordinary circumstances" in this case justify disclosure of the limited portions of Documents 12 and 13 identified above. See In re Cendant Corp. Sec. Litig., 343 F.3d at 664.

The Court concludes that Petitioner has not made this showing with respect to any of the remaining documents submitted for <u>in camera</u> review.  The Court will briefly describe the nature of those documents and the result of its <u>in camera</u> review.

Documents 1 through 8 and Document 10 are copies of documents marked with attorney notes that the Court understands Petitioner has obtained in unmarked form.  Documents 1 through 7 are pages from a Pennsylvania State Police incident report.  (Doc. No. 166 at 2.)  Document 8 is a transcript of Martin's sentencing for the charge of criminal conspiracy.  (<u>Id.</u>)  Document 10 is a transcript of the testimony of Richard Pica.  (<u>Id.</u>)  Based on its <u>in camera</u> review, the Court finds that the attorney's notes and underlining on these documents do not reflect any substantive information that is relevant to Claim II.A.

Document 9 consists of two copies of a single page of an attorney's handwritten notes, dated September 30, 1984.  (<u>Id.</u>)  These notes appear to relate to certain aspects of statements made by Martin, but the notes do not include any factual content concerning the arson-related charges or any promises of leniency in exchange for Martin's testimony.  For this reason, the Court concludes that Document 9 does not include any material that is relevant to Claim II.A.

Documents 11, 14, and 15 are handwritten attorney's notes that relate to witnesses or matters other than Martin or Buffton.  (<u>Id.</u>)  Based on its <u>in camera</u> review, the Court is satisfied that these notes do not include any material that is relevant to Claim II.A.

Document 16 is an undated typewritten and partially handwritten list, entitled "Commonwealth's Witnesses," which lists witnesses and their contact information.  (<u>Id.</u> at 3.)  While the list includes Martin, Buffton and Moran, the Court finds, based on its <u>in camera</u> review, that Document 16 does not include any material that is relevant to Claim II.A.

In sum, the Court will direct Respondents to produce the following documents:  (1) the three (3) pages of Document 12 that include notes relating to the disposition of the arson-related charges against Martin or Buffton; and (2) the three (3) pages of Document 13 that include the portions of the direct examination outlines for Martin and Buffton that relate to the disposition of the arson-related charges or whether these witnesses were promised anything in exchange for their testimony.  Those pages may be redacted as needed to avoid disclosure of opinion work product relating to other subjects.  The Court has concluded that there is no basis for requiring Respondents to produce the remaining documents submitted for in camera review.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Petitioner's motion to compel discovery.  (Doc. No. 161.)  An appropriate Order follows.